**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ESTATE OF JOHN C. FAHNER,
by Shirley Fahner, duly appointed                        Case Number: 2:08-cv-14344
personal representative, of the Estate
Fahner,                                                                    Paul D. Borman
                                                                               United States District Judge

       Plaintiff,

v.

COUNTY OF WAYNE, a corporate subunit
of Government, SHERIFF WARREN EVANS,
in his individual and official capacity,
UNDERSHERIFF, HAROLD CURETON, in his
individual and official capacity, CHIEF DIRECTOR
OF JAILS, JERIEL HEARD, in his individual and
official capacity, JAIL COMMANDER MALCOLM
D. THOMPSON, in his individual and official capacity,
SGT. MICHAEL LONG, 1661, in his individual and
official capacity, OFC. MEARS, 2685, in his individual
and official capacity, CPL. C. HALL, 1437, in his
individual and official capacity, OFC. BRIAN
GLATFELTER, 3525, in his individual and official
capacity, SEAN POLLARD a/k/a SHAWN JOHNSON,
DET. CLARA CARTER-STEELE, in her individual and
official capacity, NURSE BERNADINE TUITT, in her
individual and official capacity, LT. KEVIN SEMAK,
in his individual and official capacity, Jointly and Severally,

       Defendants.
_____/

**OPINION AND ORDER GRANTING REMAINING DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

      This matter comes before the Court on Defendants County of Wayne ("Wayne County" or

the "County"), Sheriff Warren Evans, Undersheriff Harold Cureton, Chief Director of Jails Jeriel

Heard, Jail Commander Malcolm Thompson, Sergeant Michael Long, Officer Matthew Mears,

Corporal C. Hall, and Officer Brian Glatfelter's (collectively "Defendants") motion for summary judgment. (Dkt. No. 154.) There are two additional co-Defendants in this case, Nurse Bernadine Tuitt and Sean Pollard, a/k/a Shawn Johnson. Pollard is currently incarcerated for the murder of Plaintiff's decedent John Fahner, the incident which gave rise to this litigation. Nurse Tuitt was an employee of the Wayne County Jail at the time of the incident; she has failed to respond to Plaintiff's allegations, and the Court entered a default judgment against her on December 23, 2010. (Dkt. No. 170.) Thus, she is liable to Plaintiff on the claims asserted against her. Plaintiff has filed a response to the instant motion. (Dkt. No. 167.) Defendants have not filed a reply. For the following reasons, the Court GRANTS the remaining Defendants' motion.

## I.     Background

Plaintiff brings the following claims against the Defendants:

| | |
|---|---|
| Count 1: | Violation of 42 U.S.C. § 1983 against all Defendants. |
| Count 2: | Supervisory Liability under 42 U.S.C. § 1983 against Defendants Heard, Thompson, Semak, Carter-Steele, and Long. |
| Count 3: | Gross Negligence (Michigan law) against all Defendants. |
| Count 4: | Intentional Infliction of Emotional Distress (Michigan law) against all Defendants. |

These claims stem from the murder of prisoner John Fahner ("Fahner") in the Wayne County Jail ("WCJ") on June 27, 2006. Plaintiff, Shirley Fahner ("Plaintiff"), brought this action on behalf of Fahner as his personal representative.

On June 27, Fahner, who was arrested on a bench warrant, was in the WCJ awaiting a court

2

appearance for failing to appear in court on a criminal charge alleging that he wrote a bad check.[1] Pursuant to WCJ policy, Fahner was placed in a holding cell on the first floor Registry area for what is known as "Court Pull" in the early morning of his scheduled court appearance. During Court Pull, inmates are placed in cells based on the judge they are scheduled to appear before that day.

Sean Pollard ("Pollard"), a/k/a Shawn Johnson, was also then incarcerated at the WCJ and was scheduled to appear before the same judge as Fahner on June 27, and was placed in the same cell in Registry as Fahner.

Approximately fifteen minutes after Pollard was placed in the cell, he savagely assaulted Fahner in an unprovoked attack. Pollard punched, kicked, and stomped on Fahner, who would later die from the injuries he sustained. Pollard is 5'10" tall and weighed 230 pounds; Fahner was 5'6" tall and weighed only 145 pounds. Pollard is a paranoid schizophrenic, for which he had been previously prescribed Depakote, Zyprexa, and Klonopin. Pollard alleges that at the time of the incident he had not taken his medication for nearly two months.

This dispute centers around how Pollard was processed when he arrived at the WCJ on June 26, what Pollard told WCJ employees about his mental health problems, and the WCJ's policies and procedures regarding inmates scheduled for a court appearance.

### A.    Pollard Arrives at WCJ on June 26, 2006

Pollard was transported to WCJ around 4:30 p.m., on June 26, 2006, and was processed by Deputy Mears at around 4:44 pm. Pollard's Mittimus (a writ ordered by the court directing the sheriff to convey the person identified to jail) identified him as Shawn Johnson, but also had the

---

[1] At oral argument, Plaintiff's counsel claimed that Fahner was in jail for failing to appear as a witness in a case where his sister-in-law wrote a bad check.

name Sean Pollard handwritten underneath the printed name Shawn Johnson.  (Pl.'s Amended Br. in Resp. to Defs.' Mot. Ex. 1.)  Despite the fact that both names, Johnson and Pollard, appeared on the Mittimus, Mears testified that he could not recall whether he put both names Shawn Johnson and Sean Pollard into the Inmate Management System ("IMS") on his computer when he booked Pollard, although he admitted that he would usually put in both names if two were listed.[2]  (Pl.'s Br. Ex. 9, Deposition of Matthew C. Mears 25:1-13, 38:8-13, Oct. 29, 2009.)

Whether Defendants knew that "Shawn Johnson" was really Pollard, and reviewed Pollard's criminal history is important because Pollard had an extensive history of incarceration in the WCJ system between 2002 and 2005.  (Defs.' Br. 12-13.)  A review of Pollard's history on June 27 (after Fahner was murdered) revealed that the WCJ had documented prior to the incident, that he was a paranoid schizophrenic, and listed medications he was prescribed for that condition.  Pollard's WCJ history also indicated that he had several past instances of assaultive conduct, towards both other inmates and WCJ staff.

Pollard testified that the officer who processed him called him out from his cell by the name Sean Pollard.  (Pl.'s Br. Ex. 4, Deposition of Sean Pollard 12:21-13:11, July 23, 2009.)  Pollard described this deputy as a midsized black man, weighing about 250 pounds, with a small afro.  (*Id.* at 14:3-8.)  Mears, who processed Pollard, testified that he is white, 6'2" tall, and weighs about 280 pounds, but that in June of 2006 he said he believed he was about 40 pounds heavier.  (Mears Dep.

_____

[2] Any time a prisoner arrives at the WCJ, a deputy is required to search the IMS database to see if the inmate has a history that might reveal important medical or behavioral information that would affect how the individual is ultimately classified for general housing purposes, although Classification is a separate process which may not occur until 72 hours after the inmate is received.  Deputies must also run a Wants and Warrants check through the Michigan State Law Enforcement Information Network ("LEIN") to see if there are any other outstanding warrants for the individual.

14:25-15:4.)

Elizabeth Canfield, an analyst for the State of Michigan LEIN Field Service Section, Criminal Records Division, indicated that no LEIN checks or searches were performed for either Shawn Johnson or Sean Pollard on June 26, 2006. (Pl.'s Br. Exs. 16 & 17.) Defendants claim that the LEIN system was down, not operating at that point. (Defs.' Br. 11.) The only evidence Defendants have produced to that effect is a "trouble ticket" from a Lt. Rosebomb of the Riverview police department which said "Lt. Rosebomb calling from the Riverview Police dept. States Lein is doun [sic]. Contacted Lein, lein was up. Asked Lt. if he contacted surrounding areas. He stated he did and they are up."[3] (Pl.'s Br. Ex. 11.) Accordingly, WCJ did not determine a LEIN match, and Mears gave Pollard a new Wayne County CIN under the name Shawn Johnson.[4]

### B.    Pollard's Discussions With WCJ Staff About His Mental Health

During his deposition, Pollard testified that he told two WCJ staff members that he had been diagnosed with mental health issues, that he had not taken his prescribed medications for an extended period of time, and that he had acted violently in the past when off his medications. Wayne County Sheriff's Lt. Kevin Semak testified that if Pollard had mentioned to any staff member that he had a history of mental health issues or that he felt he needed his medication, that staff member should have flagged his name and referred him to a mental health professional. (Pl.'s Br. Ex. 33, Deposition of Kevin Semak 45:6-11, Oct. 19, 2009.)

After being processed by Deputy Mears at Registry, Pollard was taken to the second floor

---

[3] Riverview is a municipality located in Wayne County.

[4] A CIN is a county identification number that is permanently assigned to an inmate the first time they enter the prison system. The number stays with that inmate throughout their entire "career" in the corrections system.

for medical questioning and to receive a TB test. Pollard remembered talking about his medications and mental illness with "a black, slim man." He said he thought the man weighed no more than 150 pounds and had a brown-skinned complexion. (Pollard Dep. 15:2-13.) However, when asked about his interactions with the officer who processed him, Pollard stated that he did not discuss his criminal history or mental health problems "until afterwards when they took the TB shots and called us to see if we took medications." (*Id.* at 14:17-21.) As stated above, Mears is white, 6'2" tall, and weighed over 280 pounds. (Mears Dep. 14:25-15:4.)

Pollard testified that he also told someone on the medical staff about his mental health issues when his TB test was administered on June 26, 2006. (Pollard Dep. 18:8-20:23.) Defendant Bernadine Tuitt was the nurse who administered Pollard's TB test. (Pl.'s Br. Ex. 5.) When Pollard was given the WCJ's standard health access/authorization for medical treatment form on the second floor, he signed his name Sean Pollard, and Tuitt wrote "aka Shawn Johnson" above it. (*Id.*) The second paragraph of the medical treatment form stated: "[u]pon arrival you will be asked questions about your immediate health needs." (*Id.*) Pollard testified that when he was asked about his mental health he told Tuitt "that I needed my medication for my mental illness and that I had a criminal history that related to not having my medication when I needed it." (Pollard Dep. 20:16-23.) Significantly, Nurse Tuitt had monitored and treated Pollard's mental health problems on previous occasions in 2003-04 when he had been incarcerated at the WCJ. (Pl.'s Br. Exs. 27-30.)

In his deposition, Pollard explained that when he does not receive his medicine he becomes anxious, afraid, and violent. (Pollard Dep. 21:8-9.) Pollard testified that the medicines have an immediate effect on him, and that had he taken his medications, the incident would not have happened. (*Id.* at 22:2-15.)

6

After the TB test, Pollard recalled being escorted to quarantine by a white officer, who had also transported him into the holding cell originally. (*Id.* at 23:4-12.) He was in quarantine by himself for about two or three hours. (*Id.* at 23:13-16, 25:23-26:4.) He testified that he was then taken back to the holding cell by a different white officer with black hair. (*Id.* at 23:17-21.) Pollard did not recall saying anything to that officer. (*Id.* at 24:12-14.) He did remember originally thinking that he was going to be transported to the mental floor where he is usually incarcerated, and where he is provided a cell to himself. (*Id.* at 24:25-25:10.) Pollard testified that he did not discuss going to the mental floor with any officers; he "took it for granted that's where [he] was going." (*Id.* at 25:11-13.)

After the Fahner incident, Pollard was interviewed by psychiatrist Dr. Watson on September 22, 2006. Dr. Watson's report allegedly noted that Pollard told him that he had not had his medication for over a month. The report also indicated that Pollard had told jail staff that he needed his medication but was not attended to. (*Id.* at 26:15-27:18.)

## C.   The Incident With John Fahner

Pollard's assault of Fahner took place in the early morning hours of June 27, 2006, in holding cell 7 on the first floor of Division I Registry. Cell 7 was the designated holding cell for all inmates scheduled to appear that day before Wayne County Circuit Judge James Chylinski.

Juan Cook was another inmate scheduled to appear before Judge Chylinski that day. (Pl.'s Br. Ex. 3, Deposition of Juan Cook 24:6-17, Feb. 8, 2010.) Cook testified that he was taken from quarantine to cell 7 in Registry at around 4:00 a.m. (*Id.*) Cook estimated that there were approximately 40 people in the cell by the time all the inmates from the various floors were rounded up, and that there were probably 300-400 prisoners in all of the Registry cells waiting to go to court.

(*Id.* at 26:3-10.)  He said that there were six officers working there at the time.  (*Id.* at 26:11-15.)
When he got into cell 7, he sat down to take a nap in a spot where he could see the bubble[5] where
the officers worked.  (*Id.* at 28:14-21.)

Fahner sat down next to Cook.  (*Id.* at 29:4.)  Cook said Fahner was very slight and appeared
scared.  (*Id.* at 29:6-9.)  At this time there were over 25 inmates in cell 7.  (*Id.* at 21-23.)  Cook
testified that when Pollard came into the cell, he "didn't appear normal."  (*Id.* at 30:9.)  When asked
to elaborate, he said "[h]e appeared to be a bug, a nutty person, a nut case."  (*Id.* at 30:24-25.)
Pollard came in and walked all the way around the cell staring at everybody.  (*Id.* at 31:19-25.)
Pollard stopped in front of Fahner, and the two started talking casually.  (*Id.* at 32:1-10.)  Then all
of a sudden, Pollard started to punch, kick, and stomp Fahner.  (*Id.* at 32:13-25.)  Cook estimated
that Pollard had been in the cell for 5-7 minutes before the attack happened.  (*Id.* at 71:7-8.)  Cook
stated that in his experience, people like Pollard prey on the smallest and weakest inmates.  (*Id.* at
47:1-4.)

Cook said that when he looked over at the bubble to see if someone was coming, the officers
were sitting up there with the lights out: "all the officers that was working down there, they was
sitting up in the bubble, some playing on the computer, playing them games on the computer, others
sitting back reading newspapers or others nodding out, but they all sitting down."  (*Id.* at 33:20-26.)
Cook said that at some point Pollard stopped kicking Fahner and called for help saying "man down,
help, help, man down."  (*Id.* at 34:7-13.)  According to Cook, it took the officers in the bubble 7-10
minutes to respond.  (*Id.* at 34:12-13.)  Cook testified that at first the officers did not think the

---

[5] The bubble is the term used to describe the area where the officers and deputies in
Divison I Registry sit; it is an enclosed area with transparent windows all around.

8

incident was a big deal, but "when they realized and looked at the seriousness of what had happened, that's when they started running up in there." (*Id.* at 34:15-17.)

The deputies allegedly started to clean up Fahner's blood immediately. (*Id.* at 40:6-8.) The deputies called EMS and huddled over Fahner. (*Id.* at 40:12-16.) The ambulance took Fahner out of the cell about 15 minutes after the first deputy arrived. (*Id.* at 75:12-15.) Cook testified that no guards patrolled around the cells between 3:45 a.m. (the time he arrived at cell 7) and the time Fahner was attacked. (*Id.* at 41:17-25.) Cook alleges that the deputies never patrol these cells as they do on the quarantine floors. (*Id.* at 42:1-16.) Later in the morning, a nurse allegedly came down to Registry looking for Pollard to give him his medication. (*Id.* at 45:10-16.) Cook testified that he believed she was coming to give Pollard his medication because she called out his name and was pushing the medicine cart. (*Id.* at 20-23.)

### D.    The Subsequent Investigation

Defendant Clara Carter-Steele was the lead detective of an Internal Affairs' ("IA") investigation of this incident. (Pl.'s Ex. 35, Deposition of Clara Carter-Steele 20:20-21:5, Feb. 1, 2010.) Carter-Steele testified that she investigated only the criminal aspects of the incident. When asked if there was anybody else that she knew of assigned to do an administrative investigation into the circumstances surrounding the incident, she replied "[n]ot to my recollection." (*Id.*) This directly contradicts the testimony of Defendant Lt. Kevin Semak who testified that there was an administrative component of the investigation, but that at its conclusion they were unable to identify any specific officers that had violated any polices or procedures. (Semak Dep. 30:21-31:24.) Carter-Steele's testimony is also inconsistent with a memo Jail Commander Malcolm Thompson sent to Semak assigning IA to investigate the incident to determine "if any laws were violated and/or if any

9

departmental rules, regulations, policies, procedures or orders were violated." (Carter-Steele Dep. 55:22-57:4.) Carter-Steele, however, said that she concerned herself only with the events of June 27. (*Id.* at 26:2-6.) Mears testified that no one at Internal Affairs interviewed him about how Pollard was processed when he arrived at the WCJ. (Mears Dep. 61:4-20.)

### E.    Relevant WCJ Policies

WCJ policy is that if a prisoner is received at Registry and a review of his medical/criminal history shows that he has been diagnosed as a schizophrenic, that inmate should be flagged to see a psychiatric nurse. (Carter-Steele Dep. 58:16-59:7.) Likewise, if an inmate mentions to a WCJ employee that he has a history of mental illness or needs medication, he should similarly be flagged. (Semak Dep. 45:6-11.) These policies are designed to ensure the safety of the inmate, other prisoners, and the staff. (Carter-Steele Dep. 58:4-7.) When inmates are received, they are designated as "preclassification" until they can formally be classified for long-term housing unless the individual is flagged. (*Id.* at 61:12-14.) It can take up to 72 hours for classification to occur.

When inmates are assigned permanent housing, WCJ policy is to house prisoners with other inmates with similar characteristics. Deputy Eric Troszak testified that "[w]hat you want to do is have the same types of individuals with the same types of individuals based upon their criminal history." (Pl.'s Br. Ex. 12, Deposition of Eric Troszak 113:9-11, June 10, 2009.) He went on to explain that a classification officer would look at the inmate's "size, weight and age if they're going to be bunked with another individual in the same cell so if they're going to be housed in a double cell you want to make sure that you have same, as close as you can match, the same demographics." (*Id.* at 113:18-23.) One of these demographics is the risk profile used to classify prisoners based on the crime they were incarcerated, any history of violence if they have been incarcerated before, and

10

any other behavioral assessments.  There are eight security levels, but prisoners are also generally characterized as minimum, medium, or maximum risk.  (Pl.'s Br. Ex. 25, Deposition of Chief Director Jeriel Heard 26:13-28:16, Oct. 20, 2009.)  The reason for placing similar inmates together is to ensure the relative safety of each prisoner and the officers.  (Troszak Dep. 115:4-8.)  As far as mental health issues are concerned, the classification officer would not make any determinations; mental health professionals assess whether or not the inmate is mentally fit to be placed in the general population.  (*Id.* at 114:2-22.)

When inmates are scheduled to go to court, WCJ policy is to "pull" inmates in Division One going to court from their housing units and transport them to Registry at 3:00 a.m. the day of their scheduled appearance.  (Pl.'s Resp. Ex. 36 – Wayne County Operations Manuel, Registry, Court Appearances.)  Inmates from Division Two are rounded up and transported to Registry by 5:00 a.m.. (*Id.*)  "All Inmates shall be placed in the holding cells according to their judge."  (*Id.*)  Chief Director Heard testified that this policy requires guards to "mix up" inmates in the holding cells regardless of their classification distinctions.  (Heard Dep. 35:12-36:5.)  Although all inmates are placed together according to the judge to whom they are scheduled for appearance, there are cells designated to hold prisoners that have not been cleared to be housed with the general population. For example, maximum security inmates are not cleared to be housed with other inmates.  (*Id.* at 40:18-21.)  Additionally, if an inmate is flagged as having mental health issues or is "more vulnerable" because they are in a wheelchair or on crutches they will not be placed in a holding cell with others.  (*Id.* at 96:4-25.)  Similarly, if a deputy has reason to believe that an inmate might pose a threat to other prisoners (ie: the inmate has been assaultive or aggressive towards another inmate), he should be separated.  (*Id.* at 97:1-98:9.)  With that said, Heard admitted that an inmate classified

11

as a medium-risk prisoner for general housing would be placed in the same holding cell as a minimum-risk inmate if they were scheduled to see the same judge on that day.  (*Id.* at 42:17-19.)

In the instant case, Fahner was a minimum-risk inmate held for writing a bad check, whereas Pollard had been charged with armed robbery and assault with intent to do harm less than murder. As such, Pollard would have been, at a minimum, classified as a medium-risk prisoner.  (*Id.* at 31:7-32:25, 106:7-14.)  Had officers discovered Pollard's true identity, as well as his past criminal and medical record (which included previous assaults against other inmates and WCJ staff), he would likely have been classified as a higher-risk inmate.

## II.     Standard of Review

Summary judgment is only appropriate if there are no genuine issues of material facts and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006).  When applying this standard, courts must view all materials, including all of the pleadings, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the responsibility of establishing no issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial.  *Id.* at 324.  The non-moving party must do more than show that there is some abstract doubt as to the material facts.  It must present significant

12

probative evidence the issue exists in order to defeat a motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## III.   Discussion

Plaintiff has brought claims against Wayne County and several individuals who are executives or line employees at the WCJ for failing to prevent Fahner's death. There are essentially five aspects of Plaintiff's Complaint. First, Plaintiff argues that the individual Defendants were deliberately indifferent to the serious risk of bodily harm they knew placing Pollard in the same cell as Fahner presented. (Compl. ¶ 63.) At the same time, Plaintiff alleges that Defendant Wayne County's practices, policies, or customs also caused Fahner's death. (*Id.* ¶ 64.) Next, Plaintiff contends that Defendants Heard, Thompson, Semak, Carter-Steele, and Long are subject to supervisory liability under 42 U.S.C. § 1983 for their "reckless disregard and deliberate indifference in the supervision, hiring, training, and discipline of the individual officers." (*Id.* ¶ 73.) In Count III, Plaintiff alleges that all Defendants were grossly negligent in performing their duties. (*Id.* ¶¶ 76-81.) Finally, Plaintiff claims that Defendants are liable for intentional infliction of emotional distress ("IIED"). (*Id.* ¶¶ 82-85.) The Court will now address each of these claims in turn.

### A.   Deliberate Indifference of the Individual Defendants

#### 1.   Qualified Immunity

Defendants argue that the individual Defendants are entitled to summary judgment, in part, because of qualified immunity. (Defs.' Br. 19.) Qualified immunity protects government officials performing discretionary functions from liability for civil damages. *Mitchell v. Forsythe*, 472 U.S. 511, 526 (1985). Under the two-prong test announced in *Saucier v. Katz*, 533 U.S. 194 (2001), qualified immunity does not shield government officials from liability if the plaintiff has alleged

13

facts demonstrating that the defendant violated the plaintiff's federal rights, and that right was clearly established when the violation occurred. *Id.* at 200. The United States Supreme Court modified the procedure outlined in *Saucier* in *Pearson v. Callahan*, 555 U.S. 223 (2009). The *Pearson* Court held that courts are free to address the two prongs in whatever order they deem most logical. *Id.* at 818. As a result, courts may choose to determine whether an allegedly violated right is clearly established before deciding whether the defendant violated it or not. *Id.*

The Sixth Circuit has held that "[t]he right of an inmate to be protected from an attack by a fellow inmate" is clearly established. *See, e.g.*, *Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001). As a result, the instant claim turns on whether Plaintiff has demonstrated that a genuine issue of material facts exists as to whether Defendants were deliberately indifferent to the risk Pollard posed to other inmates, including Fahner, in violation of the Eighth Amendment. *Id.* at 621.

## 2.   Deliberate Indifference

A state official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eight Amendment's prohibition on the wanton infliction of pain as punishment. *See Farmer v. Brennan*, 511 U.S. 825, 829 (1994). Deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. The test for determining whether an officer was deliberately indifferent has both a subjective and an objective component. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

The objective component is satisfied if the plaintiff alleges that the medical need at issue is sufficiently serious. *Id.* at 702-03 (quoting *Farmer*, 511 U.S. at 834). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that

even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004).

To satisfy the subjective criterion, the plaintiff must demonstrate that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. It is not enough for the plaintiff to allege that the officer should have recognized a serious medical risk existed. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). The United States Supreme Court has said that recklessly disregarding a known medical risk satisfies this requirement. *Id.* at 839-40. Although the subjective component requires a finding of something more blameworthy than negligence, "it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result" *Id.* at 835.

Knowingly failing to protect an inmate from a substantial risk of violence at the hands of other prisoners can satisfy this requirement. *Bowles*, 254 F.3d 617, 620-21 (quoting *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990)). Where a substantial risk or threat exists, the Sixth Circuit has explained that state actors cannot escape liability simply by demonstrating that they were unaware that there was a risk or threat to the plaintiff specifically. *See e.g.*, *Curry v. Scott*, 249 F.3d 493, 507-08 (6th Cir. 2001). In *Curry*, the Sixth Circuit stated:

> Plaintiffs may prove that the defendants had actual knowledge of a substantial risk "in the usual ways," according to the Supreme Court. That is, a factfinder may infer actual knowledge through circumstantial evidence, or "may conclude a prison official knew of a substantial risk from the very fact that the risk was obvious."

15

   \*   \*   \*

Furthermore, "actual knowledge" does not require that a prison official know a prisoner would, with certainty, be harmed, or that a particular prisoner would be harmed in a certain way.

*Id.* at 506-07 (citations omitted).

Fahner's murder was an objectively serious medical risk. *See Glass v. Fields*, No. 04-71014, 2007 WL 1500175, at *8 (E.D. Mich. May 22, 2007) (finding objective component satisfied where a detainee claiming to be insane and noted as prone to violence was placed in a holding cell with the plaintiff and kicked plaintiff in the face). As such, the only issue is whether Plaintiff has presented evidence from which a reasonable jury could infer that Defendants subjectively realized the risk of placing Pollard in the same holding cell as Fahner presented, and then deliberately disregarded that risk. The Sixth Circuit has instructed that "the subjective component of a deliberate indifference claim must be addressed for each officer individually." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008) (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)) (quotation marks and brackets omitted). Plaintiffs may present general allegations, however, to prove that each individual defendant had the requisite mental state for a deliberate indifference claim. *Id.*

### a.  Officer Mears

Plaintiff claims that Pollard told Mears he had a history of mental illness and needed to take his medications when Mears processed Pollard after he arrived at WCJ on June 26, 2006. (Compl. ¶ 27.) Pollard's testimony contradicts this claim. While at the very least an issue of genuine fact exists as to whether Mears knew the person he believed was "Shawn Johnson" was also known as Sean Pollard, due to the fact that the Mittimus had both names on it, and Pollard testified that he

called him up to Registry by the name Pollard, there does not seem to be any evidence indicating that Mears knew Pollard was a paranoid schizophrenic, that he had a history of assaulting inmates, or had not taken his medication recently.

Pollard testified that he discussed his mental health with two WCJ employees. Pollard remembered talking about his medications and mental illness with "a black, slim man." He said he thought the man weighed no more than 150 pounds and had a brown-skinned complexion. (*Id.* at 15:2-13.) However, when asked about his interactions with the officer who processed him when he arrived (Mears), Pollard stated that he did not discuss his criminal history or mental health problems "until afterwards when they took the TB shots and called us to see if we took medications." (*Id.* at 14:17-21.) Pollard said that he told someone on the medical staff about his mental health issues when he was getting his TB test on June 26, 2006. (*Id.* at 18:8-20:23.) Defendant Bernadine Tuitt was the nurse who administered Pollard's TB test. (Pl.'s Br. Ex. 5.) Because Mears is white, 6'2" tall, and claimed he weighed almost 320 pounds in June 2006 (Mears Dep. 14:25-15:4), no reasonable jury could infer that Mears is the slim black man Pollard talked to, or the nurse who administered his TB test. That nurse is Defendant Bernadine Tuitt.

At oral argument, Plaintiff's counsel argued that a reasonable jury could find that Pollard told Mears about his criminal and mental health history based on Pollard's affidavit, in which he stated: "When I arrived at the Wayne County Jail, I told an officer that I had been off my medication over a month and had been in the Detroit Police Precinct for the last few days." (Pl.'s Resp. Ex. 31, Affidavit of Sean Pollard ¶ 3, May 19, 2009.) Although standing alone this general declaration could permit jurors to infer that Pollard told someone at WCJ, it does not allow the inference to be drawn that he told Mears, in light of his deposition testimony that explicitly contradicts such a

17

finding, to wit, that he did not discuss his criminal history or mental health problems with the officer who processed him – Mears.

Furthermore, although Mears was duty-bound under WCJ policy and procedure to run a LEIN check for both names that appeared on the Mittimus, there is evidence suggesting that he did not in fact run a search for Shawn Johnson or Sean Pollard. (Pl.'s Br. Exs. 16 & 17.) Indeed, one of Plaintiff's central arguments is that the information that would have alerted WCJ staff that Pollard was a threat was sufficiently linked to the name Shawn Johnson, and that running a check on either name "would have prevented the death of John Fahner." (Pl.'s Resp. 6.) Plaintiff also argues Mears should have identified Shawn Johnson as Sean Pollard, including using fingerprint scans. (*Id.* at 8-9.)

Although the facts Plaintiff alleges demonstrate that Mears was perhaps grossly negligent in processing Pollard when he first arrived at WCJ on June 26, there is no evidence to suggest that he was aware of Pollard's mental health problems or propensity for violence. As a result, Plaintiff cannot satisfy the subjective component of the *Farmer* test and Mears is therefore entitled to summary judgment on Plaintiff's deliberate indifference claim.

### b.      Nurse Tuitt

The Court finds that Plaintiff has alleged sufficient facts from which a jury could find Nurse Tuitt was deliberately indifferent to the risk of serious harm Pollard posed to fellow inmates, including Fahner. Pollard claimed he told the nurse who administered his TB test the day he was processed that he was a paranoid schizophrenic and he had not taken his prescribed medications in at least a few days. (Pollard Dep. 18:8-20:23.) Nurse Tuitt was the one who gave Pollard the TB test and was charged with obtaining Pollard's medical information. (Pl.'s Br. Ex. 5.) As a result,

18

Nurse Tuitt should have noted Pollard's medical history and flagged him to be reviewed by a mental health professional before deeming him fit to be placed in a cell with other inmates.  (Troszak Dep.111:13-15.)

Significantly, Pollard testified that Nurse Tuitt, who dealt with him during the instant incarceration, had treated him for his mental problems during his previous WCJ incarcerations.  The Court notes that although Defendant Nurse Tuitt was then an employee of the WCJ, she has failed to respond to Plaintiff's allegations, and the Court entered a default judgment against her on December 23, 2010.  (Dkt. No. 170.)  Accordingly, Plaintiff can proceed to execute the default judgment against Nurse Tuitt.

### c.    Corporal Hall, Officer Glatfelter, Sergeant Long

Defendants Hall, Glatfelter, and Long worked the midnight shift in Registry the night/morning of Fahner's death.  (Defs.' Br. 19.)  Their only involvement was working the midnight shift in Registry and responding to the assault.  (*Id.*)  The Court finds that Plaintiff has not presented evidence from which a jury could find that these Defendants were deliberately indifferent to Fahner's medical needs.

Plaintiff relied primarily on the testimony of Juan Cook, another inmate in holding cell 7 waiting to be transferred to court and sitting next to Fahner when the incident occurred, to establish what actions were taken in response to the attack.  Cook said that when Pollard started assaulting Fahner he looked over at the bubble to see if someone was coming.  He stated that the officers were sitting up there with the lights out.  (Cook Dep. 33:22-26.) He testified that "all the officers that was working down there, they was sitting up in the bubble, some playing on the computer, playing them games on the computer, others sitting back reading newspapers or others nodding out, but they all

19

sitting down." (*Id.* at 33:20-24.)  When Pollard finally stopped beating Fahner and called for help, it allegedly took the officers in the bubble 7-10 minutes to respond.  (*Id.* at 34:12-13.)  Cook explained that "when [the officers] realized and looked at the seriousness of what had happened, that's when they started running up in there." (*Id.* at 34:15-17.)

Cook's account of the Defendant's conduct demonstrates that they were perhaps negligent in performing their duties, but negligence cannot support a claim for deliberate indifference.  There is no evidence that any of the officers were aware that Pollard was mentally unstable or prone to violence.[6]  With respect to Defendants' response after the attack, there is again nothing alleged that rises beyond negligence.  There is nothing to suggest that Defendants subjectively perceived Fahner to be at risk of serious harm.  In fact, Cook testified that once they realized the seriousness of the situation Defendants came "running up in there." (Cook Dep. 34:15-17.)  The evidence shows that Defendants called EMS which arrived at the jail cell within fifteen minutes.  (*Id.* At 75:12-15.)

### d.   Semak and Carter-Steele

It appears that Semak and Carter-Steele's involvement was limited to the County's investigation of the incident <u>after</u> Fahner was murdered.  For the reasons stated more thoroughly in Section III.B.2 *infra*, the Court holds that both Semak and Carter-Steele are entitled to summary judgment with respect to Plaintiff's deliberate indifference claims against them.

---

[6] The only fact that even suggests that these Defendants should have realized that Pollard was a paranoid schizophrenic was Cook's testimony that when Pollard was placed in the cell "[h]e appeared to be a bug, a nutty person, a nut case." (Cook Dep. 30:24-25.)  There is nothing, however, to suggest (and Plaintiff does not allege) that the Defendants actually perceived Pollard as unstable or a risk to other inmates.

B.        **Wayne County's Liability**

A plaintiff may bring a § 1983 claim against a municipality or local government. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To prevail in such a suit, the plaintiff must show that the alleged violation of his federal rights was caused by a municipal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *see also Monell*, 436 U.S. at 692 (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy). A plaintiff asserting a § 1983 claim on the basis of municipal custom or policy must identify the policy, connect the policy to the municipality, and show that the specific injury at issue was caused by the execution of that policy. *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). The causal link must be strong enough to support a finding that the defendants' deliberate conduct can be deemed the "moving force" behind the violation. *Id.* (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

In *Thomas*, the Sixth Circuit identified four ways a plaintiff may prove the existence of an illegal policy or custom. 398 F.3d at 429. The plaintiff can point to (1) the government's legislative enactments or official policies; (2) actions by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom or practice of tolerating the violation of federal rights by its officers or agents. *Id.* Where no formal policy exists, the critical inquiry is whether there is a policy or custom that although not explicitly authorized "is so permanent and well settled as to constitute a custom or usage with the force of law." *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)). A municipality cannot be held liable pursuant to 42 U.S.C. § 1983 on a theory of

21

*respondeat superior*.  *Monell*, 436 U.S. at 691-95; *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

Here, Plaintiff has alleged that several polices and practices violated Fahner's constitutional rights.  Plaintiff challenges the County's policies regarding: (1) placement of inmates in holding cells together; (2) monitoring detainees; (3) monitoring inmates suffering from mental illness; (4) training officers about how to monitor inmates suffering from mental illnesses; (5) ensuring adequate staff is on hand; (6) classifying inmates; (7) identifying incoming inmates suffering from mental health problems; (8) distributing medications to mentally ill inmates; and (9) WCJ's failure to investigate and discipline employees who violated inmates' constitutional rights.  Plaintiff claims that these policies evidence that the County has a custom or practice of tolerating violations by its employees.  (Compl. ¶ 64a-ee.)[7]

### 1.    Failure to Supervise/Train

To succeed on a claim for failure to supervise or train, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendant's deliberate indifference; (3) the inadequacy caused the injury.  *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).  "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the

---

[7] It is difficult to classify the allegations contained in the 31 sub-paragraphs found in both paragraphs 63 and 64 of the Complaint.  Although the 31 sub-paragraphs are identical in both paragraphs, paragraph 63 is directed at "Defendants, and each of them," while paragraph 64 purports to articulate Wayne County's violations.  Furthermore, the same 31 sub-paragraphs are listed in their entirety in Count I (simply titled "Violation of 42 U.S.C. 1983") and Count III (Gross Negligence) of his 24 page, 85 paragraph Complaint.

training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted)).  Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

Plaintiff has not alleged any past instances of unconstitutional conduct.  As a result, any failure-to-train or failure-to supervise claims against Defendant Wayne County fail as a matter of law.  Accordingly, Defendants are entitled to summary judgment with respect to such claims.

### 2.      Investigating/Disciplining

A failure to investigate misconduct and punish those responsible can be evidence of a policy of deliberate indifference.  *See, e.g.*, *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989); *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985).  "However, a municipality's failure to investigate claims of wrongful conduct does not *per se* mandate a conclusion that the municipality has a policy of tolerating violations of citizens' rights." *McGuire v. Warner*, No. 05-40185, 2009 WL 1210975, at *6 (E.D. Mich. Apr. 28, 2009) (quoting *Morrison v. Bd. of Trs. of Green Twp.*, 529 F. Supp. 2d 807, 825 (S.D. Ohio 2007)).  The Sixth Circuit has stated that to establish a municipal liability claim based on an "inaction theory" the plaintiff must show: (1) the existence of "a clear and persistent pattern of illegal activity;" (2) that the defendant municipality had notice or constructive notice of the officer's conduct; (3) the defendant's "tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of

23

inaction;" and (4) that the custom was the cause or direct link to the constitutional violation. *Thomas*, 398 F.3d at 429 (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

In *Leach*, the Sixth Circuit affirmed the district court's ruling that the defendant county and sheriff were liable for the deliberate indifference to the serious medical needs of a paraplegic prisoner. The court noted that the plaintiff presented evidence of 14 other paraplegics who had previously suffered similar mistreatment at the jail. 891 F.2d at 1248. In addition to the multiple instances of past mistreatment of paraplegics, the court stated that "[f]urther evidence of a policy of deliberate indifference is found in the Sheriff's failure to investigate this incident and punish the responsible parties." *Id.* The court found that the sheriff's failure to investigate/discipline the allegedly abusive defendants in the particular instance at issue *coupled* with his failure to supervise and correct the jail's treatment of paraplegics in those past situations was sufficient to support the jury's finding that the sheriff was deliberately indifferent. *Id.* As a result, *Leach* did not involve a case where the failure to investigate/discipline alone was sufficient to support liability against a municipality or its top policy makers. *See McGuire*, 2009 WL 1210975, at *7.

*Marchese v. Lucas*, 758 F.2d 181, 188-89 (6th Cir. 1985), on the other hand, represents a case in which the Sixth Circuit has held that failing to investigate and impose discipline for the events that caused the plaintiff's injuries could lead to municipal liability under *Monell*; *see also McGuire*, 2009 WL 1210975, at *7. In *Marchese*, the plaintiff was severely beaten by police officers while being arrested after he pulled out a gun and pointed it at a policeman. The plaintiff alleged he sustained two beatings. First, as he was being brought into the station house while he was handcuffed and attempted to flee, and second, in his cell that night after one of the guards unlocked his cell and admitted an unidentified person to the cell who assaulted him with a hard object.

24

*Marchese*, 758 F.2d at 182. Additionally, the individual officer defendants all testified that they had not received any training in the care, treatment, and handling of prisoners in their custody. *Id.* at 188.

The Sixth Circuit upheld the *Marchese* jury verdict in favor of the plaintiff, holding that the district court did not err by failing to grant the sheriff or county's motion for a directed verdict or judgment notwithstanding the verdict on the plaintiff's failure to investigate, train, and discipline claims. *Id.* The court stated that the officers' conduct "obviously shocked the conscience" and concluded that the facts established that the "official policy" of the sheriff and Wayne County, as represented by him in police matters, did not require appropriate training and discipline or "serious investigation to discover the perpetrators or official sanctions" when an inmate is assaulted by officers. *Id.* The court found "official toleration, (if not complicity in instigation) of the midnight assault on the part of the command officers on duty at the station house that night . . . followed by a complete failure to initiate and conduct any meaningful investigation on the part of the Sheriff himself." *Id.* at 187-88.

A subsequent Sixth Circuit decision found that failing to initiate an investigation regarding one isolated incident, without more, is insufficient to sustain a claim under *Monell*. *See, e.g.*, *Fox v. Van Oosterum*, 176 F.3d 342, 348 (6th Cir. 1999). In *Fox*, the Sixth Circuit affirmed the district court's grant of summary judgment regarding the plaintiff's failure to investigate claim with respect to the county and sheriff defendants "because [plaintiff] has not presented evidence indicating that [the sheriff's] decision was either part of a county policy or custom of refusing to investigate meritorious claims or anything other than an isolated, one-time event." *Id.*

25

Subsequent district court decisions conclude that *Marchese* cannot be read to impose municipal liability any time there is a failure to investigate misconduct because that would eviscerate the requirements established in *Monell*, particularly the general rule that the policy or practice must cause the plaintiff's injury. *See Tompkins v. Frost*, 655 F. Supp. 468, 472 (E.D. Mich. 1987):

> Such an interpretation of *Marchese* is illogical. Wrongful conduct after an injury cannot be the proximate cause of the same injury. Moreover, *Monell*, forbids a finding of county liability except where the misconduct is pursuant to an official policy or custom and is also the "moving force" behind the plaintiff's injury. The misconduct by the county must also be either intentional or at the least, grossly negligent . . . . *Marchese*, in light of *Monell* and its progeny, makes a post-injury failure to investigate a fact which may permit an inference that the misconduct which injured the plaintiff was pursuant to an official policy or custom. Any other reading would permit respondeat superior liability for the failure to undertake an investigation and would thus by-pass the stringent proximate cause requirements.

*Id.*; *see also McGuire*, 2009 WL 1210975, at * 8-9 (granting the municipal and individual defendants summary judgment on the plaintiffs' failure to investigate claim because "Plaintiffs seek to impose liability on the municipal defendants in this case on the basis of a single instance where the Chief has not yet investigated a complaint").

Similarly, in *Dubose v. Morristown*, No. 2:07-cv-115, 2009 WL 1766008 (E.D. Tenn. June 22, 2009), the district court rejected the plaintiff's claim that the defendant jailor or sheriff were liable under § 1983 for failing to investigate officers the plaintiff alleged beat him while he was in the drunk tank. *Id.*, at *12. The plaintiff argued that the defendants "encouraged and condone[d]" the officers' actions by failing to investigate the incident. *Id.* The court found, however, found that "[p]laintiff offers nothing other than an allegation that the Sheriff and Inman did not investigate the

events that occurred the night he spent in jail[,]" and held that "[t]his is not proof of a policy or custom of refusing to investigate." *Id.*

Here, as in the cases described above, Plaintiff simply alleges that the County, Steele-Carter, and Semak failed to investigate whether any officers or nurses violated WCJ policies or procedures to support the claim that the County had a policy of failing to investigate and discipline officers for such violations. The facts of this case are distinguishable from *Marchese*, the only case where the Sixth Circuit found liability predicated solely on a municipal's failure to investigate one alleged instance of misconduct. Unlike the plaintiff in *Marchese*, Fahner was assaulted by another inmate, not WCJ staff. *See Marchese*, 758 F.2d at 187-88. Also, there is no evidence of "official toleration, (if not complicity in instigation)" of Pollard's attack by the County. *See id.*

Furthermore, a review of the investigation from the County's perspective demonstrates that it was not deliberately indifferent and does not have a policy of failing to investigate incidents. Commander Malcolm Thompson sent Semak a memo requesting internal affairs to investigate the incident between Fahner and Pollard. (Semak Dep. 24:7-25:2.) As part of that order, Thompson asked internal affairs to "determine if any laws were violated and/or if any department rules, regulation, policies, procedures or orders were violated." (*Id.* (quotation marks omitted).) Although Carter-Steele testified that she did not ultimately investigate any WCJ employee conduct from the day before the incident when Pollard was processed, the fact that Thompson's orders were negligently carried out does not establish that the County had a practice of failing to investigate employee misconduct or discipline violating officers. Accordingly, the Court holds that Plaintiff has failed to establish facts from which a reasonable jury could find that the County had a policy,

practice, or custom of failing to investigate employee misconduct or that any such failure caused Fahner's injuries.

### 3.      "Court Pull" Policies

Plaintiff also alleges that several policies surrounding how inmates are housed and monitored while they wait and prepare to be transferred to court, caused Fahner's death.  (Compl. ¶ 64.) Specifically, Plaintiff alleges that WCJ failed "to establish and maintain a policy of forbearance from holding unclassified or pre-classified inmates in cells with other inmates" and "to establish and maintain a policy of forbearance from comingling inmates regardless of classification." (*Id.* ¶ 64aa, bb.)  Plaintiff also claims that Defendants are liable for "[p]lacing Sean Pollard in registry holding cell without knowing his physical or mental state, and whether or not he presented a risk of harm to others, knowing that the failure to do so would result in the comingling of unclassified inmates in holding cells, and the comingling of dangerous, violent inmates with non-violent inmates, that would result in the violation of the Constitutional rights of inmates to be free from bodily harm." (*Id.* ¶ 64z.)  Finally, Plaintiff contends that Defendants' policy of not doing rounds to check on inmates being held in Registry for Court Pull demonstrates that WCJ had a policy or custom of inadequately monitoring detainees.  (*Id.* ¶ 64c.)

### a.      Commingling Prisoners

To state a failure-to-protect claim against a prison official under the Eighth Amendment, the plaintiff must demonstrate "(1) that he is incarcerated under conditions posing a substantial risk of serious harm, and (2) that the prison official had the state of mind of deliberate indifference to inmate health or safety." *Lyons v. Holden-Selby*, 729 F. Supp. 2d 914, 918 (E.D. Mich. 2010)

28

(quoting *Farmer*, 511 U.S. at 838) (quotation marks omitted). The United States Supreme Court has explained that plaintiffs need not show that the defendant actually believed that a specific inmate was at risk from a specific attack; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 815 (6th Cir. 1996) (quoting *Farmer*, 511 U.S. at 842). The *Farmer* decision explained that if the plaintiff "presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and that the defendant was exposed to those facts, then such evidence could be sufficient to raise a genuine issue of material fact that the defendant had actual knowledge of the risk. *Farmer*, 511 U.S. at 842-43.

Defendants cannot be held liable, however, for not anticipating "hypothetical" risks of danger, even if they ultimately befall the plaintiff. *See Lewis v. McClennan*, 7 F. App'x 373, 375 (6th Cir. 2001) (holding that African-American plaintiff's claims that defendants should have known that placing him in a jail with a large population of white inmates put him at risk of being attacked were without merit because the plaintiff "ha[d] not alleged any specific facts which would show that he was in danger of being assaulted by the other inmates").

In *Street*, the Sixth Circuit held that a corrections official's motion for summary judgment should have been denied with respect to the plaintiff's failure-to-protect claim because there was evidence that the plaintiff's assailant (another inmate) asked the defendant guard "what would you do if I kicked [Street's] ass?" or "what would you do if I knock [Street] out?", after he had been told that the two prisoners had been involved in an argument earlier that day. 102 F.3d at 816. The court found that there were issues of fact as to whether those comments allowed the defendant to draw the inference that the plaintiff was at risk of serious harm and whether the defendant in fact drew such

29

an inference. *Id.* The court, however, held that summary judgment was appropriate for other guards who were aware of the earlier argument but had not heard the specific comments described above. *Id.* at 817. This was true even though the other guards knew that the plaintiff's assailant had a history of violent incidents. *Id.*

Plaintiff's complaint alleges that Defendants were deliberately indifferent by placing Pollard, an inmate Plaintiff claims Defendants knew was both violent and mentally unstable, in the same cell as Fahner. This however, claims too much. As the Court has already described, it appears that as a result of Mears' negligent booking when Pollard first arrived, none of the remaining Defendants were aware of either his past criminal record or his mental health history. Taking the facts in the light most favorable to Plaintiff, with the exception of Nurse Tuitt and an unidentified slim black deputy, Pollard did not tell anyone about his mental problems. Although it is WCJ's policy to have such inmates flagged if a WCJ employee becomes aware of such information, there is no evidence in the record to suggest that either Tuitt or the unidentified deputy alerted any of the Defendants about this information. As a result, Defendants' deliberate indifference cannot be based on facts they did not actually know. Nevertheless, Plaintiff may still claim that Defendants were deliberately indifferent to the general risk posed by placing large inmates charged with violent crimes in the same cell as relatively diminutive inmates being held for non-violent crimes, as was the case here. The Court, however, concludes that these facts do not establish sufficient evidence from which a jury could find that the individual Defendants or WCJ's policies regarding Court Pull demonstrated deliberate indifference.

Assuming a failure-to-protect claim can be directed at a municipality based on the theory that a policy, practice, or custom failed to protect a plaintiff, Plaintiff's allegations fail as a matter of law

because they do not demonstrate that a substantial risk of inmate attacks resulting from the mixing of prisoners during Court Pull was "longstanding, pervasive, well-documented, or expressly noted by prison officials." *See Farmer*, 511 U.S. at 842-43; *Hester v. Morgan*, 52 F. App'x 220, 223 (6th Cir. 2002) ("The mere fact that Turney Center housed some violent prisoners or that violence among the inmates would sometimes occur does not establish an Eighth Amendment violation. There is no evidence that the risk of inmate attacks was 'longstanding, pervasive, well-documented or expressly noted by prison officials in the past.'") (citations omitted).

There are times when housing decisions can trigger liability for failing to protect the incoming inmate. *See, e.g.*, *Wilson v. Wright*, 998 F. Supp. 650, 657 (E.D. Va. 1998) ("[A] prison official incurs Eighth Amendment liability if he or she in making a cell assignment knows of, and is deliberately indifferent to, a substantial risk of serious harm one inmate generally poses to any assigned cellmate."). In *Wilson*, the plaintiff was a 5'8", 136 pound white 19-year-old man sentenced for breaking and entering, burglary, and grand larceny, who was assigned to share a double cell with Robert Ramey, a 38-year-old, 6'1", 290 pound African American man serving a sentence for abduction-with-intent-to-defile and forcible sodomy of a 12-year-old boy. *Id.* at 652. Seven days after the plaintiff was transferred, he was raped by Ramey. *Id.*

The defendant who made the cell assignment claimed that although the policy was to read both inmates' files before making a cell-assignment, she typically only read the incoming prisoner's. *Id.* The plaintiff's file rated him as "non-violent." *Id.* The file also included a psychologist's report on the plaintiff indicating that he suffered from anxiety and fear of being assaulted by more aggressive and larger inmates. *Id.* It also explained that part of this fear was caused due to a deformity of his lower spine which caused his buttocks to protrude, and which prompted many

31

abusive remarks that were of a sexual nature. *Id.* Finally, it stated "[d]ue to his impulsivity, immaturity, and small stature he may well be victimized as he fears." *Id.* Ramey's file indicated that he was an inmate with a high propensity for violence and had a long history of disciplinary problems and violence while in prison. *Id.* Such problems included sexually assaulting cellmates, assaulting other inmates and guards, and disobeying orders. *Id.* at 653.

With respect to court transfers, a recent case from the Northern District of Illinois, is factually analogous to the instant case. *See Williams v. County of Cook*, No. 09-C-0952, 2010 WL 3324718 (N.D. Ill. Aug. 19, 2010). In *Williams*, the plaintiff, a pre-trial detainee, claimed that the defendants failed to protect him from two assaults at the hands of other inmates. *Id.*, at *1-2. At first, Williams was housed in Division Ten, a maximum security unit. *Id.*, at *2. Because he had been stabbed twice before (it is unclear whether he was stabbed while in prison) and gang members were forcing him to hold knives, he feared his life was in danger. As a result, Williams signed himself into protective custody. *Id.* He remained in protective custody until someone recognized him there and threatened him. When he informed an unidentified supervisor about the threat he told Williams that all he could do was sign himself out of the protective custody unit. *Id.* After he did that, Williams was returned to Division Ten. *Id.* Once there, Williams became so terrified that he barricaded himself in his cell and began feeling suicidal because he was without his psychotropic medication. *Id.* After speaking with a health care provider and promising to come out of his cell, Williams was reclassified as a minimum security inmate and transferred to protective custody. *Id.*

Despite this reclassification, the plaintiff was transported to court along with the general population inmates. *Id.* Williams alleged that one of the inmates accompanying him to court attacked him. *Id.* After the incident he was written up (presumably for his role in the incident on

the way to court), he was placed in the segregation unit where he was again exposed to inmates from the general population. *Id.*, at *3. There were no incidents while Williams was in the segregation unit, and when the health care professional who reclassified him found out he was there, he ordered Williams to be returned to the minimum security protective custody unit. *Id.*

The second assault Williams allegedly suffered came again during a court visit. *Id.* After his court hearing, Williams was placed in a "transition bullpen" while he waited for an officer to take him back to his housing unit. *Id.* During this time, 20-25 detainees approached him and asked him what gang he belonged to. *Id.* After he told them he did not belong to a gang, they struck, kicked, and stabbed him, requiring hospitalization for his injuries. *Id.*

Despite these claims, the court held that "the complaint does not articulate colorable causes of action under 42. U.S.C. § 1983 against the movants with regard to either attack." *Id.*, at *4.[8] In part, the court reasoned "the mere presence of general population inmates in the plaintiff's environs was not, alone, enough to create an objectively serious risk of harm." *Id.* The court further found that "[g]roup movement to the court is a regular task for correctional officials at a jail," and stated that "[i]f there is a rule against commingling protective custody and general population inmates during court visits, then correctional officials' purported heedlessness is no cause for commendation. But neither negligence nor gross negligence implicates the Constitution." *Id.*, at *5-6.

In the instant case, the Court finds that absent evidence that a substantial risk of inmate attacks resulting from the mixing of prisoners during Court Pull was "longstanding, pervasive, well-documented, or expressly noted by prison officials," Plaintiff's claims against Wayne County or the

---

[8] The court did, however, hold that the plaintiff's allegations that the defendants denied him access to his psychotropic medication could support a claim for deliberate indifference to his serious medical needs, and granted him leave to amend his complaint to include them. *Id.*, at *9.

individual Defendants for deliberate indifference based on the existence or application of WCJ's Court Pull policies must fail as a matter of law.  *See Farmer*, 511 U.S. at 842-43.  Plaintiff has not produced any evidence that there is a history of violence at WCJ between inmates of different classifications or those that have not yet been classified at all during Court Pull.  Nor has any evidence been presented demonstrating that any of the remaining individual Defendants read or heard anything that would indicate that Pollard posed a risk to other inmates or that Fahner was particularly susceptible to attack like the plaintiff in *Wilson*.

The Court also notes that although WCJ policy is to cabin inmates according to their judge during Court Pull, Heard testified that the policies do not mix maximum security inmates from Division I and provide adequate flexibility for situations in which it is determined that a particular inmate needs to be segregated from the general population.  (Heard Dep. 40:18-21, 96:4-25, 97:1-98:9.)  Heard explained that "[i]f an inmate displays behavior that poses any threat to another inmate, then our policy allows that inmate to be separated and segregated based on their aggressive or assaultive behavior or threat of behavior." (*Id.* at 46:2-6.)  As a result, any claim Plaintiff has for injuries Fahner suffered as a result of any unreasonable application of these policies sounds in negligence and cannot constitute deliberate indifference under *Farmer*.  Accordingly, these claims fail as a matter of law.

### b.    Monitoring in Registry

Plaintiff claims that WCJ's policy of not having the guards do rounds in Registry demonstrates that it has a policy, practice, or custom of inadequately monitoring inmates awaiting to go to court.  (Compl. ¶ 64c.)  Lt. Semak testified during his deposition about WCJ's monitoring policies for Registry.  He stated that unlike officers working floor security on general housing floors,

officers working in the Registry do not have a responsibility to make rounds.  (Semak Dep. 11:15-17.)  When asked why not, he explained "[t]hey don't have set rounds.  For maintaining security everybody in Registry is responsible to maintain security in Registry."  (*Id.* at 12:8-11.)  He added, "[t]hey're in and out of those cells so frequently that there's not a set specific that they have to do an hourly round."  (*Id.* at 12:20-22.)

First, the Court notes, as it did above when discussing the individual officers' liability for deliberate indifference, that any claim Plaintiff is making that the officers working in the Registry that night failed to adequately monitor cell 7 that night, sounds in negligence.  In order for the County to be held liable, Plaintiff must prove that the policy of not requiring Registry officers to conduct hourly rounds caused Fahner's injuries.  Plaintiff introduced the testimony of Juan Cook, another inmate in cell 7 on the night in question, to describe the conduct of the officers working in Registry.  Cook estimated that in his cell there were approximately 40 people by the time all the inmates from the various floors were rounded up, and that between all the cells there were probably 300-400 prisoners in all of the cells in Registry waiting to go to court.  (Cook Dep. 26:3-10.)  He said that there were six officers working there at the time.  (*Id.* at 26:11-15.)  When he got into cell 7, he sat down to take a nap in a spot where he could see the bubble where the officers were.  (*Id.* at 28:14-21.)  Cook estimated that Pollard had been in the cell for 5-7 minutes before the attack happened.  (*Id.* at 71:7-8.)

Cook said that when he looked over at the bubble to see if someone was coming, the officers were sitting up there with the lights out.  (*Id.* at 33:22-26.)  He testified that "all the officers that was working down there, they was sitting up in the bubble, some playing on the computer, playing them games on the computer, others sitting back reading newspapers or others nodding out, but they all

sitting down." (*Id.* at 33:20-24.) Cook said that at some point Pollard stopped kicking Fahner and called for help saying "man down, help, help, man down." (*Id.* at 34:7-13.) According to Cook, it took the officers in the bubble 7-10 minutes to respond. (*Id.* at 34:12-13.)

The Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact exists as to whether WCJ's policy of not requiring the officers working in Registry to do hourly rounds caused Fahner's injuries. There are two crucial aspects of Cook's testimony that support this conclusion. First, Cook estimated that Pollard attacked Fahner 5-7 minutes after he entered cell 7. Obviously, Pollard was escorted to the cell by a guard. That means that even if WCJ required hourly rounds, another officer would not have been coming by in time to stop the assault. This assessment coincides with Semak's description of Registry's policies, and his testimony that the reason hourly rounds are not required in Registry is that officers are moving around in there so often transferring and preparing to re-admit inmates to and from court. (Semak Dep. 12:20-22.) Indeed, by Cook's estimate, there were almost 300-400 prisoners individually processed in Registry that night/morning.

Even if the failure to require rounds is not cause to hold the County liable, Plaintiff could still argue that WCJ had a policy of inadequately monitoring the Registry by simply having too few guards or placing them in a position where supervision was obviously going to be a problem. Such arguments, however, must also fail due to the second important aspect of Cook's testimony. Cook stated that he was able to see all the officers in the bubble from cell 7 and describe what each of them was doing. (Cook Dep. 33:22-26.) Although the rest of Cook's testimony depicts the officers as inattentive and slow to respond, such evidence only demonstrates that those officers were negligently performing their duties. It does not speak to institutional policies, practice, or customs

36

they followed which in turn caused Fahner's injuries.  For these reasons, Plaintiff's claims against the County under 42 U.S.C. § 1983 fail as a matter of law.

### C.      Supervisory Liability

A supervisory employee cannot be held liable pursuant 42 U.S.C. § 1983 on a theory of *respondeat superior*.  *Monell*, 436 U.S. at 691-95; *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).  In order for a supervisor to be liable, the plaintiff must show that the supervisor encouraged the specific misconduct at issue or in some way directly participated in it.  *Cardinal v. Metrish*, 564 F.3d 794, 802-03 (6th Cir. 2009) (quoting *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002)); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  Supervisory liability cannot be predicated on a showing that the defendants had the right and obligation to control employees.  *Bellamy*, 729 F.2d at 421 (citing *Hays*, 668 F.2d at 872-74).  Nor can it be based on "a mere failure to act."  *Combs*, 315 F.3d at 558.  Instead, it must be based upon "active unconstitutional behavior."  *Id.*

Here, Plaintiff has not alleged any facts indicating that any of the named supervisory Defendants – Heard, Thompson, Semak, Carter-Steele, or Long – were directly involved in the alleged Constitutional violations or that they encouraged any of the WCJ staff that may have been deliberately indifferent to Fahner's safety in this specific instance.  *See Cardinal*, 564 F.3d at 802-03.  Instead, Plaintiff claims "these defendants acted with reckless disregard and deliberate indifference in the supervision, hiring, training, and discipline of the individual [] officers." (Compl. ¶ 73.)  It seems that Plaintiff has conflated its supervisory liability allegations with claims for municipal liability under a failure-to-train theory.  *See Phillips*, 534 F.3d at 543-44 ("The Estate's general allegations that the correctional officers and paramedics were not properly trained are more

37

appropriately submitted as evidence to support a failure-to-train theory against the municipality itself, and not the supervisors in their individual capacities.") Although it is true that an individual supervisor may still be liable in her individual capacity under a failure-to-train theory, Plaintiff must allege facts demonstrating that the supervisor Defendants were directly involved or encouraged the specific misconduct at issue. *See id.* at 544. Because Plaintiff has failed to make such allegations, Plaintiff's claims against the supervisor Defendants fails as a matter of law. Accordingly, Defendants are entitled to summary judgment with respect to those claims.

### D.    Gross Negligence

Plaintiff claims that all Defendants are "individually and vicariously liable" for various acts or omissions that Plaintiff contends constitute gross negligence. (Compl. ¶ 79.)[9] Defendants argue that they are immune from liability for Plaintiff's state law claims under the Government Tort Liability Act ("GTLA"), Mich. Comp. Laws § 691.1407 ("Section 7"). (Defs.' Br. 17-18.) Because Section 7 differentiates between immunity for government agencies and individual officers, employees, or members, immunity for Defendant Wayne County City will be analyzed separately from that of the individual Defendants. *See* § 1407(1), (2).

### 1.    Application of the GTLA to Defendant Wayne County

In the GTLA, the Legislature clearly stated, "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function." *Mack v. City of Detroit*, 467 Mich. 186, 195 (2002) (quoting §1407(1)). As a result, an agency is immune unless the GTLA specifically permits a civil suit by citizens. *Id.*

---

[9] Again the same 31 sub-paragraphs are enumerated in Count III (Gross Negligence) of Plaintiff's Complaint. (Compl. ¶ 79.)

38

In *Mack*, the Michigan Supreme Court identified five exceptions to governmental immunity for an agency.  *Id.* at 195 n.8.  They are the "highway exception," Mich. Comp. Laws § 691.1405; the "motor vehicle exception," § 1405; the "public building exception," § 1406; the "proprietary function exception," § 1413; and the "governmental hospital exception," § 1407(4).  *Id.*  The Legislature has also codified one other exception, the "sewage disposal system event exception."  § 1416.

The plaintiff must plead facts in avoidance of governmental immunity.  *Mack*, 467 Mich. at 204.  Plaintiffs can accomplish this "by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a non-governmental or proprietary function.  *Id.*  A "governmental function" is anything that is expressly or impliedly authorized by state law.  *Id.* (quoting Mich. Comp. Laws § 691.1401(f)).  In *Mack*, the court held that the management and operation of a police department was a well-established government function.  *Id.*  Similarly, operating a jail is a government function.  As a result, because Plaintiff has not alleged that her claims fall within one of the statutory the Court finds that Wayne County is immune from Plaintiff's state-law claims.

### 2.    Application of the GTLA to the Individual Defendants

The Michigan Supreme Court recently articulated the test for determining whether an individual defendant is entitled to governmental immunity under Michigan state law in *Odom v. Wayne County*, 482 Mich. 459 (2008).  The *Odom* court clarified the intersection between Section 7 and *Ross v. Consumers Power Co. (On Rehearing)*, 420 Mich. 567 (1984).  *Odom*, 482 Mich. at 467-468.  In 1984, *Ross* comprehensively described the common-law test for individual governmental immunity for all tort actions.  *Id.* at 468.  The court held that judges, legislators, and the highest executive officials of all levels of government were immune from all tort liability when

39

acting within the scope fo their governmental authority. *Ross*, 420 Mich. at 633. Lower-level officials were immune under the theory of qualified immunity if: their acts were taken during the course of employment and within the scope of that employment; they were taken in good faith; and they were discretionary/decisional, but not ministerial/operational. *Id.* at 633-34.

In 1986, the Michigan State Legislature amended the GTLA in response to *Ross*. *Odom*, 482 Mich. at 468. Section 7(2) affords individual immunity to government officials "without regard to the discretionary or ministerial nature of the conduct in question," when the officer's actions were in the course of employment and (a) the employee "is acting reasonably believes he or she is acting within the scope of his or her authority;" (b) while discharging a governmental function; and (c) the conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." *Id.* at 468-69. The Sixth Circuit recently instructed that under Michigan law, "[s]tatutory grants of government immunity should be broadly construed, with exceptions construed narrowly." *Smith v. County of Lenawee*, 600 F.3d 686, 690 (6th Cir. 2010).

In the instant case, the only issue is whether the gross negligence Plaintiff alleges was the proximate cause of Fahner's death. The Michigan Supreme Court has held that in order to be the proximate cause of an injury, the defendant's actions must be "the one most immediate, efficient, and direct cause of the injury or damage." *Robinson v. City of Detroit*, 462 Mich. 439, 462 (2000). In defending this construction, the *Robinson* court emphasized that the Michigan Legislature chose to use the definite article "the" as opposed to the indefinite article "a." *Id.* at 461-62 (quoting *Hagerman v. Gencorp Auto.*, 457 Mich. 720, 753-54 (1998) (Taylor, J. dissenting)).

Although a jury could consider many of the individual Defendants' actions grossly negligent, they are all entitled to immunity under the GTLA because under Michigan law none of those actions

40

were *the* proximate cause of Fahner's death. Indeed, in this case it seems unmistakable that "the one most immediate, efficient, and direct cause of the injury or damage" sustained by Fahner was Pollard's assault.

Recently, a United States District Judge in the Eastern District of Michigan applied *Robinson* to similar claims in *Fletcher v. Michigan Department of Corrections*, No. 09-13904, 2010 WL 1286310, at *7 (E.D. Mich. Mar. 30, 2010). In *Fletcher*, the plaintiff was bipolar and also suffered from other mental illnesses. *Id.*, at *1. In 2006, a Livingston County Circuit Court judge issued a Maintenance Order requiring the plaintiff to be transferred to the Center for Forensic Psychiatry ("CFP"). *Id.* Despite this order, the plaintiff was incarcerated at the Oakland County Jail ("OCJ") in October 2006 because CFP allegedly failed or refused to pick him up from Oakland County Circuit Court. While being held at OCJ, plaintiff claimed he was assaulted by a guard. The plaintiff brought several claims against a variety of defendants. As part of his complaint, the plaintiff accused individual employees at CFP of gross negligence. *Id.*, at *6-7. The plaintiff argued that the individual defendants were not entitled to immunity under the GTLA because their gross negligence in failing to adhere to the Maintenance Order was the proximate cause of his injuries because as a result of their actions he was forced to remain at OCJ where he suffered the assault. *Id.*, at *7. The district court, however, held that the plaintiff's gross negligence claims were barred because *the* proximate cause under *Robinson* was the assault and battery itself, "not any action or inaction by the individual Defendants." *Id.*

In *Basso v. State of Mich. Dep't of Corr.*, No. 08-cv-75, 2009 WL 929028, at *7-8 (6th Cir. Apr. 3, 2009), the Sixth Circuit came to a similar conclusion. In *Basso*, the plaintiff was a corrections officer who alleged that the warden and other Department of Corrections officers

41

encouraged inmates to riot and assault him after he was allegedly transferred to a more dangerous shift in retaliation for criticizing the warden. *Id.* Even though the plaintiff suffered several serious injuries, the Sixth Circuit held that under *Robinson*, the plaintiff's injuries were most directly and immediately caused by the rioting inmates. *Id.*, at *8.

### E.    Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must prove: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *The Detroit News, Inc. v. Duran*, 200 Mich. App. 622, 629-30 (1993) (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985)).  "The trial court must determine as a matter of law whether the defendant's conduct was so extreme and outrageous to withstand a motion for summary disposition." *Id.* Liability will only be found when the defendant's conduct is so outrageous and extreme that it goes beyond all bounds of decency and is "to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v. Mills*, 212 Mich. App. 73, 91 (1995) (citing *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342 (1993)). The conduct must make the average member of the community exclaim "Outrageous!" when described to her. *Id.*; *see also Roberts*, 422 Mich. At 603.

In *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483 (6th Cir. 2002) the plaintiff brought several claims against the Michigan Department of Corrections and several individual defendants, including one for intentional infliction of emotional distress, after his wife was murdered by an inmate at the Huron Valley Men's Facility ("HVMF"), a Michigan state prison. *Id.* at 486.  The decedent was killed while working as the storekeeper at the HVMF. *Id.*  The plaintiff argued that the defendants' failure to prevent the decedent's murder made them liable for IIED. *Id.* at 496.  The Sixth Circuit

42

affirmed the district court's conclusion that the plaintiff failed to make out a claim for IIED. *Id.* at 497. The court explained that even though the defendants may have been negligent in failing to protect the decedent, none of their actions "went beyond all possible bounds of decency such that they could be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 496 (quotation marks omitted). The court also emphasized that the defendants did not kill the plaintiff's wife, and any criticism of the HVMF's policies or the individual defendants' failure to protect her from coming into contact with her killer only related to errors of judgment. *Id.* Such negligence, the court held, fell short of the outrageous behavior required to sustain a claim for IIED. *Id.* at 497.

In *Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005), the Sixth Circuit held that the plaintiff's allegations that police officers denied her insulin which resulted in her being hospitalized and treated for diabetic ketoacidosis the next day were insufficient to sustain a claim of IIED. 407 F.3d at 799. The court stated "Garretson has not offered proof that the officers *intended* to subject her to emotional distress by specifically denying her medical treatment. Nor has she shown that by allegedly neglecting her medical care, officers would expect her to experience emotional distress." *Id.* (emphasis in original).

The Court holds that Plaintiff has failed to demonstrate sufficient facts from to support her claim for IIED. Negligently conducting intake procedures can hardly be described as outrageous conduct that goes beyond all possible bounds of decency, that must be regarded as atrocious, and is utterly intolerable in a civilized community. As in *Sperle*, Defendants did not kill the decedent, and any actions that ultimately led to Fahner's death cannot support Plaintiff's IIED claim. Additionally,  it cannot be said that any of the alleged actions by Defendants were calculated to cause Fahner's death or to subject him to emotional stress. *See Garretson*, 407 F.3d at 799. For

those reasons, the Court holds that Defendants are entitled to summary judgment on Plaintiff's IIED claim.

## IV.    Conclusion

For the reasons stated above, the Court GRANTS the remaining Defendants' motion for summary judgment.  The Court notes that judgment has been entered against then-WCJ nurse Bernadine Tuitt.  The Court finds that there is no evidence from which a jury could find that any of the individual Defendants (with the exception of Nurse Tuitt, who is not a party to the remaining Defendants' motion) were deliberately indifferent to the risk Pollard posed to Fahner, or Fahner's serious medical needs after the assault occurred.  Additionally, Plaintiff's claims against the County for failing to train, supervise, investigate, or discipline fail as a matter of law.  The Court further holds that Plaintiff has not presented sufficient evidence to support its claim for supervisory liability under section 1983, that the GTLA bars any recovery on Plaintiff's gross negligence claim, and that Plaintiff's allegations are insufficient to support a claim for IIED.

**SO ORDERED.**


S/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 22, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 22, 2011.


S/Denise Goodine_____
Case Manager

44